**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Tia DeFazio, | No. CV-25-00450-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before this Court is Plaintiff Tia DeFazio's appeal from the Commissioner of the Social Security Administration's ("SSA," "Commissioner," or "Defendant") denial of Social Security benefits. (Doc. 9-3). The appeal is fully briefed (Doc. 16; Doc. 21; Doc. 24), and the Court now rules.

## I.    BACKGROUND

### A. Factual Overview

Plaintiff was 41 years old on her alleged disability onset date of February 18, 2016. (Doc. 13 at 29). She has at least a high school education. (*Id.*). Plaintiff filed for disability insurance benefits ("DIB") on April 19, 2017, and supplemental security income ("SSI") on April 12, 2017, alleging disability beginning February 18, 2016. (*Id.* at 5). An ALJ held a hearing and subsequently issued a decision denying Plaintiff's claim on October 9, 2019. (*Id.*). The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the agency's final decision. (*Id.*). A Judge in this District remanded the case pursuant to the parties' stipulation. (Doc. 10-5 at 2).

1    On remand, the ALJ again denied Plaintiff's claim in a decision dated May 4, 2022.

2    (Doc. 10-4 at 27). The Appeals Council denied Plaintiff's request for review. (Doc. 13 at

3    5). Another Judge in this District remanded pursuant to the parties' stipulation for an ALJ

4    to consider Plaintiff's claim de novo and issue a new decision. (Doc. 13-1 at 41). On

5    remand again, another ALJ denied Plaintiff's claim in a decision dated December 9, 2024.

6    (Doc. 13 at 27). Plaintiff filed the present appeal following this unfavorable decision. (Doc.

7    16 at 5).

8    **B. The SSA's Five-Step Evaluation Process**

9    To qualify for social security disability insurance benefits, a claimant must show

10    that he "is under a disability." 42 U.S.C. § 423(a)(1)(E). To be "under a disability," the

11    claimant must be unable to engage in "substantial gainful activity" due to any medically

12    determinable physical or mental impairment. *Id.* § 423(d)(1). The impairment must be of

13    such severity that the claimant cannot do his previous work or any other substantial gainful

14    work within the national economy. *Id.* § 423(d)(2). The SSA has created a five-step

15    sequential evaluation process for determining whether an individual is disabled. *See* 20

16    C.F.R. § 404.1520(a)(1). The steps are followed in order, and each step is potentially

17    dispositive. See *id.* § 404.1520(a)(4).

18    At Step One, the ALJ determines whether the claimant is engaging in "substantial

19    gainful activity." *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is work activity that

20    is (1) "substantial," i.e., doing "significant physical or mental activities," and (2) "gainful,"

21    i.e., usually done "for pay or profit." 20 C.F.R. § 416.972(a)–(b). If the claimant is

22    engaging in substantial gainful work activity, the ALJ will find the claimant is not disabled.

23    *Id.* § 404.1520(a)(4)(i).

24    At Step Two, the ALJ determines whether the claimant has "a severe medically

25    determinable physical or mental impairment" or severe "combination of impairments." *Id.*

26    § 404.1520(a)(4)(ii). To be "severe," the claimant's impairment must "significantly limit"

27    the claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c).

28    If the claimant does not have a severe impairment or combination of impairments, the ALJ

will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(ii).

At Step Three, the ALJ determines whether the claimant's impairment(s) "meets or equals" an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the ALJ will find the claimant is disabled, but if not, the ALJ must assess the claimant's "residual functional capacity" ("RFC") before proceeding to Step Four. *Id.* §§ 404.1520(a)(4)(iii), 404.1520(e). The claimant's RFC is his ability perform physical and mental work activities "despite [his] limitations," based on all relevant evidence in the case record. *Id.* § 404.1545(a)(1). To determine RFC, the ALJ must consider all the claimant's impairments, including those that are not "severe," and any related symptoms that "affect what [the claimant] can do in a work setting." *Id.* § 404.1545(a)(1)–(2).

At Step Four, the ALJ determines whether the claimant has the RFC to perform the physical and mental demands of "his past relevant work." *Id.* §§ 404.1520(a)(4)(iv), 404.1520(e). "Past relevant work" is work the claimant has "done within the past five years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it." *Id.* § 404.1560(b)(1)(i). If the claimant has the RFC to perform his past relevant work, the ALJ will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). If the claimant cannot perform his past relevant work, the ALJ will proceed to Step Five in the sequential evaluation process.

At Step Five, the final step, the ALJ considers whether the claimant "can make an adjustment to other work," considering his RFC, age, education, and work experience. *Id.* § 404.1520(a)(v). If so, the ALJ will find the claimant not disabled. *Id.* If the claimant cannot make this adjustment, the ALJ will find the claimant is disabled. *Id.*

### C. The ALJ's Application of the Factors

Here, at Step One, the ALJ concluded that the record established that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of February 18, 2016. (Doc. 13 at 8).

At Step Two, the ALJ determined that Plaintiff had the following severe

impairments: "systemic lupus erythematosus, lumbar degenerative disc disease, migraines, posttraumatic stress disorder (PTSD) and generalized anxiety disorder." (*Id.*).

At Step Three, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equaled a listed impairment in Appendix 1 to Subpart P of 20 C.F.R. Part 404. (Doc. 13 at 11). The ALJ then found that Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand and walk for six hours in an eight-hour day and sit for six hours in an eight-hour day. The claimant can occasionally climb ramps and stairs, but never climb ladders or scaffolds. The claimant can frequently balance, stoop and crouch, and occasionally kneel and crawl. The claimant must avoid concentrated exposure to extreme heat, fume, odors, dusts, gases and hazards. The claimant can understand and remember simple instructions, follow simple instructions, make simple work-related decisions, and perform simple tasks. The claimant can have occasional contact with coworkers and public, and can adapt to simple changes in a routine work environment.

(*Id.* at 14–15). At Step Four, the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 29).

At Step Five, considering the Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could make successful adjustments to a significant number of other jobs that exist in the national economy. (*Id.*). Examples included routing clerk, storage facility rental clerk, and small products assembler. (*Id.* at 30). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date through December 9, 2024. (*Id.*).

## II.    LEGALS STANDARD

This Court may not set aside a final denial of disability benefits unless the ALJ decision is "based on legal error or not supported by substantial evidence in the record." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). "Substantial evidence" is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).

It involves "more than a scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). This Court, in its review, must consider the record in its entirety, "weighing both the evidence that supports and evidence that detracts from the [ALJ's] conclusion." *Revels*, 874 F.3d at 654 (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2007)).

The ALJ—not this Court—is responsible for resolving ambiguities, resolving conflicts in medical testimony, determining credibility, and drawing logical inferences from the medical record. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). Therefore, when the evidence of record could result in more than one rational interpretation, "the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [courts] must defer to the ALJ's conclusion."). Further, this Court may only review the reasons the ALJ provides in the disability determination; the Court "may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

## III.  DISCUSSION

Plaintiff argues that the ALJ committed harmful error in rejecting the medical opinions of: (1) treating nurse practitioner Richard Horn, (2) treating nurse practitioner Katharine Kazaka, and (3) the state agency's reviewing consultants, Dr. Andres Kerns and Dr. Jaine Foster-Valdez. (Doc. 16 at 3). Specifically, Plaintiff argues that the ALJ "provided no legally valid reason" for rejecting these medical opinions because the ALJ's stated bases for rejecting the opinions are not supported by substantial evidence. (*Id.* at 19–20).

### A.  Legal Standard for Evaluating Medical Opinions

In evaluating medical opinions, the Ninth Circuit previously employed the "treating physician rule," which distinguished between treating physicians, examining physicians, and non-examining physicians, generally giving the greatest weight to the opinions of

treating physicians. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). However, in March 2017, the SSA amended their regulations to abrogate the treating physician rule, among other changes, and all claims filed on or after March 27, 2017, must adhere to these amended regulations. *Alonzo v. Comm'r of Soc. Sec. Admin.*, No. CV-18-08317-PCT-JZB, 2020 WL 1000024, at *3 (D. Ariz. Mar. 2, 2020) (citing *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5852–57 (Jan. 18, 2017)); *see Woods v. Kijakazi*, 32 F.4th 785, 791–92 (9th Cir. 2022). The amended regulations state that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

Moreover, the Ninth Circuit has determined that in cases governed by the amended regulations, the "specific and legitimate" standard is no longer applicable, meaning an ALJ is no longer required to articulate "specific and legitimate reasons" for rejecting a treating physician's opinion. *Woods*, 32 F.4th at 791–92. Instead, the amended regulations provide that in considering all medical opinions, an ALJ should consider several enumerated factors, including supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c); *Alonzo*, 2020 WL 1000024, at *3. Supportability and consistency are the "most important factors," and the ALJ must articulate how he considered supportability and consistency in determining how persuasive a medical opinion is. 20 C.F.R. § 404.1520c(b)(2). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Woods*, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* (quoting 20 C.F.R. § 404.1520c(c)(2)). If the ALJ finds that two or more medical opinions differ slightly but are equally well-supported and consistent with the record, then the ALJ must also articulate how he considered the other enumerated factors. 20 C.F.R.

1  § 404.1520c(b)(3).

2  **B. Nurse Practitioner Horn's Medical Opinion**

3  Plaintiff argues that the ALJ erred in rejecting NP Horn's opinion that Plaintiff could

4  not perform light work. (Doc. 16 at 8). NP Horn reported in his March 2017, August 2018,

5  and June 2019 opinions that Plaintiff had limited range of motion of the hips, thighs, knees,

6  and lower legs with repetitive use; bilateral shoulder or arm conditions causing pain with

7  movement; functional loss of spinal range of motion causing muscle spasms and an

8  abnormal gait; and functional loss or impairment of her hands causing pain with movement.

9  (Doc. 13 at 25–26). The ALJ summarized NP Horn's opined limitations as follows:

> Nurse Horn asserted the claimant was limited to lifting and/or carrying less
> than five pounds frequently; could stand for less than one hour and sit for
> less than one hour in a normal eight-hour workday; would require the ability
> to alternate between sitting and standing every 15 to 20 minutes; would need
> to elevate her legs every 30 minutes; would never be able to perform any
> postural maneuvers; and would have an 60-85% limitation in reaching; an
> 85% limitation in handling, a 65% limitation in fingering, an 85% limitation
> in seeing, a 75% limitation in hearing, and a 95% limitation in speaking
> (Exhibits 15F/1-3; 29F/1-3; 38F/1-3). Nurse Horn also asserted her physical
> impairments would cause three, four, or more unscheduled absences from
> work per month, and that she has an extreme limitation in her ability to "deal
> with" any work stress (Exhibits 15F/1-3; 29F/1-3; 38F/1-3).

17  (*Id.* at 26). Plaintiff argues that based on NP Horn's opinion, Plaintiff is limited to sedentary

18  work, which requires lifting no more than 10 pounds, occasionally lifting or carrying small

19  articles, and involves sitting but occasionally requires walking and standing. (Doc. 16 at

20  8); *see* 20 C.F.R. § 404.1567(a).

21  In determining Plaintiff's physical limitations at Step Three, the ALJ also

22  considered the opinions of two medical consultants who both opined that Plaintiff could

23  perform light work with certain limitations. (Doc. 13 at 22). Light work requires lifting no

24  more than 20 pounds and carrying up to 10 pounds, a good deal of walking or standing, or

25  sitting most of the time with some pushing and pulling. 20 C.F.R. § 404.1567(b).

26  Accordingly, there was conflicting medical evidence regarding Plaintiff's physical

27  limitations. "When there is conflicting medical evidence, the [ALJ] must determine

28  credibility and resolve the conflict." *Thomas*, 278 F.3d at 956–57 (quoting *Matney v.*

1   *Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1989)). Here, after examining the entire record and

2   weighing the conflicting medical evidence, the ALJ concluded that objective medical

3   evidence supports that Plaintiff "would have some difficulty performing more than light

4   exertional work due to her lupus, lumbar degenerative disc disease and migraines," but that

5   Plaintiff was "able to perform light work with postural and environmental limitations

6   described in her RFC." (Doc. 13 at 29).

7       In determining Plaintiff's RFC, the ALJ rejected NP Horn's medical opinion as

8   unpersuasive. (*Id.* at 26). The ALJ provided three legally valid bases for rejecting NP

9   Horn's opinion, finding that his opined limitations were unsupported by the record,

10  internally inconsistent, and inconsistent with the objective evidence in the record. (*Id.*); *see*

11  *Woods*, 32 F.4th at 792 (noting that an ALJ may reject a medical opinion as unsupported

12  or inconsistent so long as the finding is supported by substantial evidence); *Houghton v.*

13  *Comm'r Soc. Sec. Admin.*, 493 F. App'x 843, 845 (9th Cir. 2012) (stating that finding an

14  opinion internally inconsistent is a valid basis to reject a medical opinion); *Worth v. Astrue*,

15  330 F. App'x 642, 644 (9th Cir. 2009) (same); *Tristan v. Comm'r of Soc. Sec. Admin*, No.

16  CV-20-02240-PHX-DWL, 2022 WL 1707953, at *3 (D. Ariz. May 27, 2022)

17  ("[R]egardless of whether [an] ALJ's finding of internal inconsistency between [a

18  provider's notes and assessment] is characterized as a flaw of 'consistency' or

19  'supportability,' it serves as a permissible basis for discounting [a] medical opinion under

20  the new SSA regulations."). Substantial evidence supports the ALJ's reasons for rejecting

21  NP Horn's medical opinion.

22      Addressing the inconsistencies between NP Horn's opinions and the objective

23  evidence on the record, the ALJ noted:

24          The claimant has a documented diagnoses of lupus and migraine headaches;
            however, the medical evidence shows symptoms from these impairments are
25          less severe and less frequent than alleged and largely normal functioning
            during physical examinations. Her providers did not find any evidence of
26          fever, malaise or involuntary weight loss. While they noted the claimant
            exhibited fatigue, they did not indicate the severity of this symptom (Exhibits
27          21F/4; 36F/64). Additionally, the record contains only a single manifestation
            of lupus, occurring in June 2017 (Exhibit 22F/5). During physical
28          examinations, [Plaintiff] consistently exhibited normal range of motion,
            strength, sensation, and reflexes in the bilateral upper and lower extremities,

1
2
3
4
5
6
7

> with a normal gait and no evidence of longitudinal musculoskeletal weakness (Exhibits 5F/2-3, 6, 10, 13; 9F/2-3, 6, 10, 14, 18, 21, 32-33, 36, 40, 44, 48, 51; 16F/17, 23; 18F/2, 5, 8, 11, 14, 19, 22, 25; 20F/3-4; 26F/11; 31F/6, 29, 34, 73, 86, 90, 101, 105, 109, 113, 117, 143, 147; 37F/11). The claimant's medications were controlling her pain reasonably well. She was utilizing the medications to control pain and to maintain her functional status and quality of life. The claimant endorsed greater than 30 percent quality of life improvement from her current medication regimen. The claimant denied any side effects of medications, such as constipation, nausea, vomiting, or excessive sedation. (Exhibit 46F/3, 16, 42, 49, 52, 55, 58, 61, 67, 70). The claimant was taking prednisone for lupus flares, which she stated averaged about twice a year (Exhibit 46F/1).

8
9

(Doc. 13 at 26). Additionally, the ALJ found NP Horn's 2017, 2018, and 2019 opinions internally inconsistent with his own notes from a 2020 visit:

10
11
12

> In 2020, Nurse Horn noted no active synovitis of subcutaneous nodules shoulders or joint effusion. Range of motion of wrists, elbows, and active range of motion of the shoulders were within normal limits. Internal and external rotation of the hips were mildly limited. Knee flexion was normal bilaterally. There was no swelling of the knees or ankles (Exhibit 45F/9).

13
14
15
16
17
18

(*Id.* at 26–27). Moreover, because NP Horn's objective observations indicated that Plaintiff's range of motion was mostly normal, and "nothing in the reports from a non-clinical setting" indicated "the severe level of disability" opined by NP Horn, the ALJ found that NP Horn's more severe limitations "appear to have been based on the claimant's subjective complaints" and were therefore unsupported by objective medical evidence. (*Id.* at 27).

19
20
21
22
23
24
25
26
27
28

Plaintiff first argues that the ALJ erroneously relied on "a single examination of Plaintiff by NP Horn three and a half years after NP Horn's medical statement was issued," and thus that no evidence supports the ALJ's conclusion that NP Horn's opinion was internally inconsistent. (Doc. 16 at 19). However, the Commissioner correctly points out that while the ALJ used the 2020 visit as an example, NP Horn's notes from 2016, 2017, and 2018 visits contain the same language that reflects less severe impairments than opined by NP Horn. (Doc. 21 at 12; Doc. 9-8 at 167, 173, 179, 183); *see Lopez v. Colvin*, 194 F. Supp. 3d 903, 910 n.1 (D. Ariz. 2016) ("Although the Court may not affirm the ALJ's decision based on grounds not set forth in the ALJ's opinion, the Court can consider evidence not specifically mentioned in the opinion if it was available to the ALJ and

1    supports the ALJ's stated grounds for decision.").

2        Plaintiff also argues that NP Horn's opined limitation in range of motion "with
3    repetitive use" in a work environment is not inconsistent with NP Horn's notes that Plaintiff
4    had a normal range of motion during physical examinations in a clinical setting. (Doc. 16
5    at 19). As previously discussed, the "ALJ is responsible for resolving conflicts in medical
6    testimony, and resolving ambiguity." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d
7    595, 603 (9th Cir. 1999). The Ninth Circuit Court of Appeals has specified that
8    "[d]etermining whether inconsistencies are material (or are in fact inconsistencies at
9    all) . . . falls within this responsibility." *Id.* The ALJ's findings must be upheld "if
10   supported by inferences reasonably drawn from the record." *Batson*, 359 F.3d at 1193.
11   Here, the ALJ reasonably inferred that if Plaintiff's limitations were as severe as NP Horn
12   opined, NP Horn's objective observations of Plaintiff during visits would reveal some level
13   of impairment. Instead, NP Horn observed during multiple visits that Plaintiff's range of
14   motion in her arms and knees were "normal," and range of motion in her hips was only
15   "mildly limited." (*See* Doc. 9-8 at 167, 173, 179, 183). The ALJ could reasonably conclude
16   that NP Horn's opined limitations are internally inconsistent with his notes. Discrepancies
17   between a medical provider's treatment notes and opinion is a valid reason for an ALJ to
18   reject that provider's opinion. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005);
19   *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Tristan*, 2022 WL 1707953, at *3
20   ("[An] ALJ's finding of internal inconsistency between [a provider's notes and
21   assessment] . . . serves as a permissible basis for discounting [a] medical opinion under the
22   new SSA regulations."). Therefore, substantial evidence supports the ALJ's decision to
23   reject NP Horn's opined limitations.

24       Next, Plaintiff argues that NP Horn did not base his opinions on Plaintiff's
25   subjective complaints, pointing to the Medical Source Statement questionnaires. (*See* Doc.
26   16 at 19; Doc. 9-9 at 191–92). In the Medical Source Statement questionnaire dated March
27   17, 2017, NP Horn indicated that he based his opined physical limitations on tests and
28   symptoms confirming Plaintiff's lupus diagnosis and the fact that lupus is an autoimmune

disease that affects joints. (*See* Doc. 9-9 at 191–92). In the Medical Source Statement questionnaires dated August 7, 2018, and June 20, 2019, NP Horn similarly indicated that he based his opined physical limitations on tests confirming Plaintiff's lupus diagnosis, including antinuclear antibody ("ANA") testing, the Physician Global Assessment ("PGA"), and the Systemic Lupus Erythematosus Disease Activity Index ("SLEDAI"). (*See* Doc. 10 at 93–94; Doc. 10-3 at 98).

The objective evidence NP Horn identified supports Plaintiff's diagnosis of lupus, which has the potential to cause physical limitations, but the ALJ acknowledged that Plaintiff's diagnoses are supported by objective evidence and accounted for them in Plaintiff's RFC. (*See* Doc. 13 at 18–20). NP Horn offers no explanation as to how he reached the severe limitations assessed, particularly given his objective observations that Plaintiff appeared mostly normal during physical examinations. *See Schultz v. Astrue*, 362 F. App'x 634, 636 (9th Cir. 2010) (concluding that "the ALJ properly inferred" that a doctor's opinion "was based on [the claimant's] own reports" because the doctor "offered no medical findings or rationale to support her conclusion"). NP Horn's notes documenting Plaintiff's subjective complaints appear to be the only support for NP Horn's opined limitations. (*See* Doc. 9-8 at 167, 173, 179, 183). Therefore, the ALJ reasonably concluded that NP Horn relied on Plaintiff's subjective complaints.

The Ninth Circuit Court of Appeals has held that an ALJ may reject a medical opinion that is "based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible." *Ghanim*, 763 F.3d at 1162 (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2014)). Here, the ALJ discredited Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms" to the extent they are inconsistent with the record. (Doc. 13 at 16). Plaintiff does not challenge the ALJ's finding that Plaintiff's symptoms are "less severe and less frequent than alleged." (*Id.* at 16, 26; *see generally* Doc. 16). Therefore, substantial evidence supports the ALJ's decision to reject NP Horn's opinion as unsupported by the record.

Moreover, Plaintiff does not address the other objective evidence identified by the ALJ as inconsistent with NP Horn's opinion. The ALJ recounted specific evidence that was contradictory to NP Horn's opinion. (Doc. 13 at 26; *see* Doc. 21 at 11). For example, the ALJ discussed the observations of various providers that Plaintiff's strength and range of motion appeared normal during physical examinations, and reports that her medications were controlling her pain reasonably well, both of which are inconsistent with the severe level of impairment opined by NP Horn. (Doc. 13 at 26). *See Morgan*, 169 F.3d at 601 (finding that substantial evidence supported the ALJ's determination of inconsistency when the ALJ "listed specific examples of how the level of impairment indicated by [the medical source] was unreasonable given the . . . other evidence in the record"). Additionally, the ALJ discussed the medical opinions of Dr. Melvin Roberts and Dr. J. Wright, both of which stated that Plaintiff could perform light work. (Doc. 13 at 22). NP Horn's opined limitations—which Plaintiff argues limit her to sedentary work—are inconsistent with those medical opinions. (*See id.* at 26–27; Doc. 16 at 8); *see Morgan*, 169 F.3d at 602 (stating that inconsistency between medical opinions is a valid justification for rejecting a medical opinion). Therefore, substantial evidence supports the ALJ's finding that NP Horn's opinion was inconsistent with the record.

### C. Nurse Practitioner Kazaka's Medical Opinion

Plaintiff argues that the ALJ erred in rejecting NP Kazaka's medical opinion regarding Plaintiff's mental limitations. (Doc. 16 at 3, 20). In NP Kazaka opined in May 2017, July 2018, and July 2019 that Plaintiff had marked to extreme limitations in every category of mental abilities and aptitude needed to do unskilled, semi-skilled, or skilled work; marked limitation in activities of daily living; moderate to marked limitation with maintaining social functioning; frequent to constant deficiencies of concentration, persistence, or pace; and continual episodes of decompensation. (*See id.* at 22–24; Doc. 9-9 at 179–89; Doc. 10 at 85–91; Doc. 10-3 at 100–06). NP Kazaka indicated that her opined limitations were supported by objective evidence, including clinical interviews, mental status examinations, and displayed behaviors in the office. (*See* Doc. 16 at 23).

1    The ALJ rejected NP Kazaka's medical opinion as unpersuasive. (Doc. 13 at 24).

2    First, the ALJ found NP Kazaka's opinion "inconsistent with the objective medical

3    evidence of record," noting:

> During mental status examinations, the claimant occasionally exhibited
> irritable, constricted, depressed, anxious, slightly agitated, or indifferent
> mood and affect consistent with her PTSD and anxiety disorder (Exhibits
> 1F/11, 30-31, 38, 49; 12F/48-49, 82, 94; 27F/10, 15; 34F/9-10; 43F/13, 14,
> 76). However, frequently throughout the record she exhibited neutral,
> euthymic, congruent, or normal mood and affect. She exhibited fair to good
> eye contact, appropriate grooming and hygiene, and normal speech with no
> difficulty communicating. Despite some moderate limitations, the claimant
> demonstrated largely normal cognitive functioning during mental status
> examinations. She exhibited variable memory generally ranging between
> "fair," "good" and "intact" although she did display "poor" memory during
> two examinations in May 2017 and July 2018. She also regularly displayed
> logical thought processes and associations, unremarkable stream of thought,
> and consistently good fund of knowledge. She exhibited concentration and
> attention ranging from "fair" to "good." Furthermore, she consistently
> appeared alert and oriented (Exhibits 1F/2, 11, 13, 17, 31, 51; 2F/5; 4F/2;
> 5F/2, 6, 10, 13; 6F/13, 15, 18, 22; 8F/4; 12F/15, 31, 43, 49, 62, 75-76, 83-84,
> 86- 87, 96; 9F/2, 51; 16F/20; 19F/4, 5, 10, 13; 20F/4; 22F/3, 8; 23F/6, 13,
> 14, 19, 22, 34; 25F/3; 26F/4, 11, 17; 27F/2, 6, 10, 13, 19; 30F/1, 6; 31F/2, 6,
> 69, 120, 135, 147; 32F/4, 7, 9; 34F/10, 18- 19, 27, 35; 35F/9, 13, 16, 20;
> 37F/5, 11, 16; 43F/7, 11, 22, 32, 59). She reported her ruminating thoughts
> diminished following treatment with prescription medication Zoloft. (Exhibit
> 27F/1, 5). Despite reported rumination and signs of agitation, she had no
> difficulty sleeping. Additionally, the claimant was purposely off her
> medications at that time (Exhibit 12F/48).

(*Id.*).

Additionally, the ALJ found that NP Kazaka's opined limitations were "not

supported by her own treatment notes as well as the evidence of record," explaining:

> The claimant's treatment with Nurse Kazaka was sporadic in late 2018
> through 2021. In 2021, Nurse Kazaka noted the claimant had not been seen
> for over a year, as she was hiding from Covid. She reported not taking her
> prescribed medication due to a "weird reaction" to Klonopin. Other
> compliance issues were also noted (Exhibit 43F/35). In her treatment notes,
> Nurse Kazaka reported that mental status examinations of the claimant were
> normal (Exhibit 43F/7). The limitations opined appear to have been based on
> the claimant's subjective complaints more so than the claimant's overall
> presentation. In July 2018, Nurse Kazaka noted that the claimant needed
> disability update paperwork done, which took the majority of her
> appointment. The disability paperwork was done with the claimant who
> responded to Nurse Kazaka's questions throughout (Exhibit 34F/26). The
> claimant's representative argued the disproportionate nature of the
> limitations opined were because the observations were in a clinical setting,
> whereas the opinions were how the claimant would respond in a professional
> setting. Regardless, there was nothing in the reports from a non-clinical
> setting indicating the severe level of disability opined by Nurse Kazaka.

1    (*Id.* at 24–25). The ALJ also explained:

2           Nurse Kazaka noted in her opinions that the claimant experienced severe side
            effects with multiple medications in the past (Exhibit 13F/3). Yet, throughout
3           the record the claimant denied medication side effects (Exhibits 5F/1-2;
            18F/16; 31F/76; 46F/3, 16, 42, 46, 49, 52, 55, 58, 61, 67, 70; 50F/11, 15, 58;
4           51F/24). Nurse Kazaka noted her opinion was based on discussions with the
            claimant regarding her work history and cognitive tests. However, the
5           claimant obtained a score of 28 out of 30 on the mini mental status exam
            indicating normal cognition (Exhibit 48F).
6

7    (*Id.* at 21).

8           Plaintiff argues that the ALJ erred in finding NP Kazaka's opinion inconsistent with

9    the record. (Doc. 16 at 15–17). Specifically, Plaintiff argues that NP Kazaka's statement

10   that Plaintiff had "extreme problems with most medications" is not inconsistent with

11   Plaintiff reporting no side effects on her current medication; that Plaintiff's daily activities

12   do not contradict NP Kazaka's opinion; and that Plaintiff being alert, having no difficulty

13   sleeping, and having reduced rumination of thoughts on Zoloft is not inconsistent with NP

14   Kazaka's opinion because she did not rely on alertness or orientation in forming her

15   opinion. (*Id.*). However, Plaintiff does not address the other evidence cited by the ALJ as

16   inconsistent with NP Kazaka's opinion. For example, NP Kazaka opined that Plaintiff had

17   marked to extreme limitations in her ability to carry out "very short and simple

18   instructions." (Doc. 9-9 at 186; Doc. 10 at 88; Doc. 10-3 at 103). The ALJ cited to evidence

19   in the record indicating Plaintiff had "largely normal cognitive functioning during mental

20   status examinations," and "regularly displayed logical thought processes and associations,

21   unremarkable stream of thought, and consistently good fund of knowledge." (Doc. 13 at

22   24). Because the ALJ cited other examples of how NP Kazaka's opinion was inconsistent

23   with the record, even if Plaintiff is correct that some examples are not actually inconsistent,

24   this would be harmless error because substantial evidence supports the ALJ's finding that

25   NP Kazaka's opinion was inconsistent with the record as a whole.

26          Plaintiff also argues that the ALJ erred in relying on Plaintiff's "noncompliance."

27   (*See* Doc. 16 a 17–18). Regarding inconsistency, the ALJ referenced NP Kazaka's

28   treatment notes, where she stated that Plaintiff reported "she purposefully didn't take her

Clonazepam so NP could see what she's like off of it." (Doc. 13 at 24; Doc. 9-9 at 126). The ALJ did not err in considering this fact because it is relevant that the severity of Plaintiff's symptoms documented by NP Kazaka were based in part on Plaintiff's symptoms when not taking her prescribed medication. Regarding supportability, the ALJ noted that Plaintiff's treatment with NP Kazaka between 2018 and 2021 was "sporadic." (Doc. 13 at 24). NP Kazaka's notes from a 2021 visit stated that Plaintiff "hasn't been seen in over a year" because she was "hiding from Covid." (Doc. 11-1 at 8). NP Kazaka also noted that Plaintiff "hadn't taken [Klonopin] in a long time but still had supply left." (*Id.*). The Ninth Circuit Court of Appeals has indicated that an ALJ may validly reject a medical opinion based on a claimant's "gaps in treatment" with the medical provider. *See Blacksher v. Berryhill*, 762 F. App'x 372, 375 (9th Cir. 2019) (noting "the ALJ properly relied upon [the claimant's] gaps in treatment with" the provider in rejecting the provider's opinion); *Evans v. Berryhill*, 759 F. App'x 606, 608 (9th Cir. 2019) (affirming the ALJ's rejection of a medical opinion in part because the claimant "received only sporadic treatment for his condition"); *cf. Orn*, 495 F.3d at 638 (noting that an ALJ may use gaps in medical treatment to discredit the alleged severity of symptoms when the impairment is such that the "stimulus to seek relief" is pronounced and treatment would likely provide relief).

Moreover, substantial evidence supports the ALJ's determination that NP Kazaka's opinion was based on Plaintiff's subjective complaints. The ALJ pointed to NP Kazaka's treatment notes from July 2018, where she noted Plaintiff "needs disability update paperwork done" and that filling out the paperwork "was the majority of the appointment." (Doc. 13 at 24; Doc. 10-2 at 73). NP Kazaka specifically noted that the paperwork "was done with patient who responded to [NP Kazaka's] questions throughout." (Doc. 10-2 at 73). Because the level of disability opined by NP Kazaka was inconsistent with her treatment notes and the objective evidence in the record, and given that NP Kazaka stated her opinion was based on Plaintiff's responses, the ALJ reasonably concluded that NP Kazaka's opined limitations appeared to be "based on the claimant's subjective complaints more so than the claimant's overall presentation." (Doc. 13 at 24). Therefore, substantial

1    evidence supports the ALJ's rejection of NP Kazaka's opinion as unsupported by the

2    record. *See Ghanim*, 763 F.3d at 1161 (noting that when a medical opinion is based "on an

3    applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not

4    credible, the ALJ may discount the treating provider's opinion"); *Bayliss*, 427 F.3d at

5    12116 (noting that internal inconsistencies between a provider's treatment notes and

6    opinion is a valid reason to discredit the opinion); *Tristan*, 2022 WL 1707953, at *3

7    ("[R]egardless of whether [an] ALJ's finding of internal inconsistency between [a

8    provider's notes and assessment] is characterized as a flaw of 'consistency' or

9    'supportability,' it serves as a permissible basis for discounting [a] medical opinion under

10   the new SSA regulations.").

11   **D. Dr. Kerns' and Dr. Foster-Valdez's Medical Opinions**

12       Plaintiff argues that the ALJ erred in rejecting the medical opinions of state agency

13   reviewing consultants Dr. Kerns and Dr. Foster-Valdez regarding Plaintiff's mental

14   limitations. (Doc. 16 at 14, 19). Specifically, Plaintiff argues that the ALJ erred in not

15   crediting the consultants' opinion that Plaintiff is "limited to reasoning level 1 work." (*Id.*

16   at 11). The ALJ summarized the consultants' opinions as follows:

17       Reviewing psychologists, Andres Kerns, Ph.D. and Jaine Foster-Valdez,
18       Ph.D., opined the claimant is able to carry out simple (one to two-step)
         instructions, follow simple work-like procedures, and make simple work-
19       related decisions. The claimant can carry out simple tasks in situations where
         a supervisor or co-worker is present to explain tasks and give directions, and
20       occasionally redirect. The claimant has adequate ability to perform at a
         consistent pace particularly if engaged in a simple task. The claimant can
21       complete tasks that do not require more than daily planning or independent
         prioritization of tasks. The claimant has a limited, but adequate, ability to
22       interact appropriately with the public, co-workers and supervisors. The
         claimant would be best suited to work with minimal social demands where
23       interaction with others is superficial, non-collaborative, and occasional. The
         claimant can work in environments where there is no expectation to resolve
24       conflicts or persuade others to follow demands. The claimant can adapt to a
         routine environment. The claimant appears capable of simple one and two-
25       step tasks in a routine and predictable environment where changes are easily
         explained, and interaction with others is superficial and occasional.

26   (Doc. 13 at 20–21). Plaintiff argues that the consultants' opined limitations are consistent

27   with level one reasoning, which the Dictionary of Occupational Titles ("DOT") defines as

28   the ability to "carry out simple one- or two-step instructions," and "[d]eal with standardized

1    situations with occasional or no variables in or from these situations encountered on the

2    job." DOT (4th ed. 1991) App'x C, 1991 WL 688702; (Doc. 16 at 11).

3              In determining Plaintiff's mental limitations at Step Three, the ALJ determined that

4    Plaintiff's longitudinal treatment history revealed that "[h]er mental impairments limit her

5    to simple, routine, and repetitive tasks and only occasional interaction with others, and

6    permit her to make simple work-related decisions." (Doc. 13 at 17). The ALJ accounted

7    for these limitations in Plaintiff's RFC, which limits Plaintiff to "performing work with

8    simple instructions, simple work-related decisions, simple tasks, simple changes in a

9    routine work environment and no more than occasional contact with coworkers and the

10   public." (*Id.* at 15, 17). The Ninth Circuit Court of Appeals has held that an RFC like

11   Plaintiff's that is limited to "simple" tasks is consistent with level two reasoning, which

12   requires an employee to "carry out detailed but uninvolved written or oral instructions" and

13   "[d]eal with problems involving a few concrete variables in or from standardized

14   situations." DOT (4th ed. 1991) App'x C, 1991 WL 688702; *Zavalin v. Colvin*, 778 F.3d

15   842, 843, 847 (9th Cir. 2015) (holding an RFC limited to "simple, routine, or repetitive

16   tasks" is incompatible with level three reasoning but consistent with level two reasoning);

17   *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (9th Cir. 2005) (noting limitation to "simple and

18   routine work tasks" is consistent with level two reasoning but inconsistent with level three

19   reasoning); *Faulkner v. Dudek*, 2025 WL 602216, at *2 (9th Cir. 2025) (determining that

20   an RFC limited to "simple, work related decisions" is incompatible with level three

21   reasoning).[1]

---

22   [1] Plaintiff argues, and the Commissioner concedes, that Plaintiff's RFC is incompatible
     with jobs requiring level three reasoning. (Doc. 16 at 11; Doc. 21 at 17). The ALJ identified

23   storage facility rental clerk as a potential job for Plaintiff, which requires a reasoning level
     of three. *See* DOT (4th ed. 1991) § 295.367-026, 1991 WL 672594; (Doc. 13 at 30). While

24   this finding was erroneous, the Court agrees with the Commissioner that this was a
     harmless error. (*See* Doc. 21 at 17). The Ninth Circuit Court of Appeals has instructed that

25   this error is harmless if the claimant can perform the remaining jobs, and those jobs exist
     in significant numbers in the national economy. *Buck v. Berryhill*, 869 F.3d 1040, 1051 &

26   n.2 (9th Cir. 2017); *Shaibi v. Berryhill*, 883 F.3d 1102, 1110 n.7 (9th Cir. 2017); *Applegate
     v. Saul*, 845 F. App'x 569, 570-71 (9th Cir. 2021) ("[E]ven if the first two jobs the VE

27   identified . . . are inconsistent with the reasoning level noted in [the claimant's] RFC, this
     error is harmless because one of the jobs the VE identified . . . indisputably meets the RFC

28   presented by the ALJ and exists in sufficient numbers in the national economy."). As
     explained, substantial evidence supports the ALJ's determination that Plaintiff can perform

In determining Plaintiff's RFC, the ALJ rejected the consultants' opinions as unpersuasive. (Doc. 13 at 21–22). The ALJ first explained that the opinions used "non-vocational terms such as 'adequate ability to perform at a consistent pace,' and 'carry out simple tasks in situations where a supervisor is present.'" (*Id.* at 21). The ALJ noted that a limitation to "simple tasks" is a different restriction than a limitation to tasks with one or two steps, and that the record suggested Plaintiff could perform simple tasks with more than one or two steps. (*Id.*).

To the extent the consultants' opinions suggested Plaintiff was limited to level one reasoning, the ALJ found that the opinions were not supported by objective evidence and instead "appear to be based on the opinions of the claimant's treating providers," NP Horn and NP Kazaka, "who relied on the claimant's subjective statements regarding the severity of her mental symptoms." (*Id.*). The ALJ discussed NP Kazaka as an example:

> For instance, Nurse Kazaka noted in her opinions that the claimant experienced severe side effects with multiple medications in the past (Exhibit 13F/3). Yet, throughout the record the claimant denied medication side effects (Exhibits 5F/1-2; 18F/16; 31F/76; 46F/3, 16, 42, 46, 49, 52, 55, 58, 61, 67, 70; 50F/11, 15, 58; 51F/24). Nurse Kazaka noted her opinion was based on discussions with the claimant regarding her work history and cognitive tests. However, the claimant obtained a score of 28 out of 30 on the mini mental status exam indicating normal cognition (Exhibit 48F).

(*Id.*). Additionally, the ALJ found that the consultants' opinions were inconsistent with the record, explaining:

> [T]he evidence of record . . . shows the claimant maintains the ability to comprehend and apply learned information; interact with others; sustain focused attention and concentration and perform daily tasks. Specifically, the record shows the claimant is able to care for her multiple dogs. She is able to go out to restaurants, shop in stores for groceries, cook, do laundry and wash dishes. During the psychological consultative examination the claimant was able to complete paperwork independently. Her affect was restricted with irritable undertones; however, she conducted herself appropriately in the lobby while waiting for her appointment and presented as polite and cooperative. The examiner noted the claimant was not particularly friendly,

jobs requiring level two reasoning. The other two occupations identified by the VE—routing clerk and small products assembler—both require a reasoning level of two. *See* DOT (4th ed. 1991) § 222.687-022, 1991 WL 672133; *id.* § 706.684-022, 1991 WL 679050. As determined by the VE, these occupations combined account for 73,707 jobs in the national economy, which is considered a significant number of jobs under Step Five. (Doc. 13 at 30); *see Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528–29 (9th Cir. 2014) (finding 25,000 jobs in the national economy is a significant number).

1    but noted her eye contact was good and her hygiene and grooming were fair.
2    Her attention and concentration abilities were intact. There was no indication
     of hyperactivity. Her comprehension was good. Her memory appeared fairly
3    intact and she appeared to function around the average range of intelligence
     (Exhibit 48F/4). During the mini mental status exam she obtained a score of
4    28 out of 30 indicating normal cognitive functioning (Exhibit 48F/5). The
     undersigned takes notice that mental status examinations reveal the claimant
5    is occasionally irritable with a constricted, depressed, anxious, slightly
     agitated, or indifferent mood and affect (Exhibits 1F/11, 30-31, 38, 49;
6    12F/48-49, 82, 94; 27F/10, 15; 34F/9-10; 43F/13, 14, 76). However,
     frequently throughout the record she exhibited neutral, euthymic, congruent,
7    or normal mood and affect, fair to good eye contact, appropriate grooming
     and hygiene, and normal speech with no difficulty communicating. The
8    claimant demonstrated largely normal cognitive functioning during mental
     status examinations. She also regularly displayed logical thought processes
9    and associations, unremarkable stream of thought, and consistently good
     fund of knowledge (Exhibits 1F/1-2, 11, 13, 17, 31; 2F/5; 4F/2; 6F/13, 15,
10   18, 22; 12F/15, 31, 43, 49, 62, 76, 82-84, 87, 91, 94-95; 8F/4; 12F/15;
     16F/20; 19F/4-5, 10, 13; 22F/3; 23F/5-6, 13-14, 22, 34; 25F/3; 26F/17;
11   27F/2, 6, 10, 14, 18; 31F/69; 32F/4, 7, 9; 34F/10, 19, 27 35; 35F/9, 13, 16,
     20; 37F/5, 11, 16; 43F/7, 59).

12   (*Id.* at 21–22).

13        Plaintiff argues that "there is no requirement that a medical source use standardized

14   vocational terms in their medical opinions" because "the ALJ is responsible for translating

15   such language into applicable vocational limitations," thus the use of "non-vocational"

16   terms was not a valid reason for the ALJ to reject the consultants' opinions. (Doc. 16 at

17   14). The Commissioner argues that the ALJ did not err in considering the language used

18   by the consultants because the ALJ is supposed to consider "other factors" in determining

19   whether a medical opinion is persuasive. (Doc. 21 at 13). While Plaintiff is correct that the

20   ALJ is responsible for translating Plaintiff's functional limitations into an RFC, *see Rounds*

21   *v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible

22   for translating and incorporating clinical findings into a sufficient RFC."), the Court agrees

23   with the Commissioner that it was not error for the ALJ to consider the use of non-

24   vocational terms in determining whether a medical source's opined restrictions are

25   persuasive.

26        The Ninth Circuit Court of Appeals and other district courts in this circuit have

27   determined that an ALJ may consider a medical opinion's use of vocationally relevant

28   terms in determining that opinion's probative value. *See Ford v. Saul*, 950 F.3d 1141, 1156

(9th Cir. 2020) (concluding that the ALJ reasonably rejected a doctor's opinion because it "did not provide useful statements regarding the degree of [claimant's] limitations" and thus was "inadequate for determining RFC"); *King v. Comm'r of Soc. Sec. Admin.*, 475 F. App'x 209, 210 (9th Cir. 2012) (noting that an ALJ may properly reject a medical opinion when it is "too vague to be useful"); *Sahar Abbas A. v. Comm'r of Soc. Sec.*, No. C22-1162-MLP, 2023 WL 3456897, at *2 (W.D. Wash. May 15, 2023) (concluding that "[t]he ALJ reasonably found that the vagueness with which [the doctor] defined Plaintiff's limitations undermined its probative value" when the opinion was "not articulated in precise vocational terms"); *Rivera v. Colvin*, No. 1:15-CV-03019-JTR, 2015 WL 6619333, at *10–11 (E.D. Wash. Oct. 30, 2015) (concluding that even if medical opinions need not use "vocationally relevant" terms, an ALJ may nonetheless find that an opinion is "too vague and general to be vocationally relevant"); *Mitchell v. Colvin*, No. CV-13-02384-PHX-JZB, 2015 WL 1186222, at *11 (D. Ariz. Mar. 16, 2015) (concluding that the ALJ did not err in disregarding a medical opinion because it was "vague and imprecise, and lacking specific work-related limitations"). Accordingly, the ALJ did not err in finding the non-vocational language in the consultants' opinions unclear and thus unpersuasive when determining Plaintiff's mental limitations.

Moreover, the ALJ suggested that the consultants' opinions were internally inconsistent because the consultants opined that Plaintiff could carry out "simple one and two-step tasks," but also that Plaintiff could "carry out simple tasks." (Doc. 13 at 20–21; Doc. 9-4 at 19–20, 62–63). The ALJ correctly pointed out that "the term 'simple tasks' is not equivalent to 1-2 step tasks." (Doc. 13 at 21); *see, e.g.*, *Zavalin*, 778 F.3d at 843, 847. Thus, it was unclear whether the consultants believed that Plaintiff was limited to reasoning level one or two. The ALJ examined the entire record and determined that "the evidence supports a greater ability to function than the performance of 1-2 step tasks." (Doc. 13 at 21). Therefore, substantial evidence supports the ALJ's decision to reject the consultants' opinion that Plaintiff was limited to one to two step tasks.

Plaintiff also argues that the ALJ erred in relying on Plaintiff's daily activities to

reject the consultants' opinions because the daily activities discussed by the ALJ are not inconsistent with the consultants' opined limitations. (Doc. 16 at 15–16). The Ninth Circuit Court of Appeals has held that an ALJ may validly reject a medical opinion if it is inconsistent with a claimant's daily activities. *See, e.g.*, *Ghanim*, 763 F.3d at 1162; *Carter v. Berryhill*, 738 F. App'x 534, 535 (9th Cir. 2018); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Here, the ALJ explained that Plaintiff's daily activities were "not limited to the extent one would expect," noting the "physical and mental capabilities" and "social interactions" required by many of the tasks. (Doc. 13 at 20). The ALJ specifically mentioned Plaintiff's ability to care for multiple dogs, go to restaurants, shop for groceries, cook, do laundry, wash dishes, manage her finances, check emails, make phone calls, and complete paperwork independently.[2] (Doc. 13 at 20–21). Based on Plaintiff's daily activities, it was reasonable for the ALJ to conclude that Plaintiff could carry out task with more than one or two steps. *See Burch*, 400 F.3d at 680 (determining it was reasonable for the ALJ to find claimant was "quite functional" when she could "care for her own personal needs, cook, clean and shop," "manage her own finances," and "interact[] with her nephew and her boyfriend"). Therefore, substantial evidence supports the ALJ's conclusion that Plaintiff's daily activities conflict with a limitation to level one reasoning. *See id.* ("Although the evidence of [the claimant's] daily activities may also admit of an interpretation more favorable to [the claimant], the ALJ's interpretations was rational, and we must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.").

Even if Plaintiff's daily activities did not contradict the consultants' opinion, Plaintiff does not challenge the other objective evidence identified by the ALJ as inconsistent with a limitation to level one reasoning. For example, the ALJ noted that Plaintiff scored 28 out of 30 on the mini mental status examination ("MMSE").[3] (Doc. 13

---

[2] Plaintiff argues that the ALJ erred in relying on Plaintiff's ability to complete routine paperwork because doing so reveals no more than "basic literacy." (Doc. 16 at 15). However, even if Plaintiff is correct, this does not impact the Court's finding regarding the other daily activities discussed by the ALJ and would thus be harmless error.

[3] *See generally Carter v. Kijakazi*, No. 2:22cv00001, 2023 WL 2967429, at *8 n.14 (W.D. Va. Apr. 17, 2023) ("The MMSE is an 11-question measure that tests seven areas of

at 21; *see* Doc. 14 at 17). As part of the MMSE, Plaintiff was able to follow a three-step command. *See Bonetti v. Comm'r of Soc. Sec. Admin.*, No. CV 18-02523, 2019 WL 13198691, at *7 (D. Ariz. Sep. 10, 2019) (noting that one question in the MMSE asks the claimant to "follow a three-step command"); *Slusher v. Comm'r of Soc. Sec. Admin*, No. CV-20-02038-PHX-SPL, 2022 WL 596801, at *3 n.4 (D. Ariz. Feb. 28, 2022) (same). The ALJ reasonably concluded that Plaintiff's performance on the MMSE contradicted the consultants' opinion that Plaintiff was limited to tasks with one or two steps. Therefore, substantial evidence supports the ALJ's determination that the consultants' opinions were inconsistent with the record.

Additionally, Plaintiff argues that no evidence supports the ALJ's finding that the consultants' opinions were based on the medical opinions of Plaintiff's treating physicians. (Doc. 16 at 12). Plaintiff concedes that if the consultants did rely on the statements of NP Kazaka and NP Horn, it would be "a valid reason to discount such evidence under the supportability factor." (*Id.* at 18). The Court agrees with Plaintiff that the ALJ erred in finding that the consultants' opined mental limitations were based on NP Kazaka's opinions. Dr. Kerns indicated that the "extreme limitations" opined by NP Kazaka were not supported by the objective evidence or her visit notes. (Doc. 9-4 at 15–16). Dr. Foster-Valdez later adopted Dr. Kerns' explanation. (*Id.* at 56). However, Plaintiff does not point to any objective evidence that supports a limitation to level one reasoning. Plaintiff argues that much of the evidence cited by the ALJ as inconsistent with the consultants' opinion was "reviewed and considered" by the consultants and "was the basis for their opinions," including observations about Plaintiff's normal mood and cognitive function. (Doc. 16 at 16). The Court finds this argument unpersuasive because, as explained above, substantial evidence supports the ALJ's conclusion that this evidence was inconsistent with the level of limitations opined by the consultants and thus does not support their opinions.

cognitive function: orientation, registration, attention and calculation, recall, language and visual construction. The maximum score is 30. A score of 24 or more is indicative of no cognitive impairment."). The psychological consultant who administered the MMSE noted that Plaintiff's "errors included an inability to recall the correct season of the year (she scoffed, 'Arizona doesn't have seasons') as well as an inability to recall one of three words she previously was asked to remember." (Doc. 14 at 17).

1    Moreover, even if the ALJ erred in its supportability analysis, this would be

2  harmless error because, as previously stated, substantial evidence supports the ALJ's

3  finding that the consultants' opinion is inconsistent with the record. *Archunde v. Comm'r*

4  *of Soc. Sec. Admin.*, No. CV-24-01993-PHX-JAT, 2025 WL 520534, at *6 (D. Ariz. Feb.

5  18, 2025) (citing *Woods v. Kijakazi*, 32 F.4th 785, 793 n.4 (9th Cir. 2022) (indicating that

6  even where an ALJ provides no supportability analysis for a medical opinion, the ALJ may

7  properly find the opinion unpersuasive so long as there is an inconsistency finding

8  supported by substantial evidence)); *see also Collins v. Colvin*, No. 23-35526, 2024 WL

9  5040992, at *2 (9th Cir. Dec. 9, 2024) (because the inconsistency of the doctor's opinion

10  provided a sufficient basis to find it unpersuasive, "any error related to the supportability

11  analysis counts as harmless and does not provide a basis for reversing").

12  **IV.    CONCLUSION**

13    For the foregoing reasons,

14    **IT IS ORDERED** that the ALJ's decision is **AFFIRMED**.

15    **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment

16  accordingly.

17    Dated this 15th day of October, 2025.

18

19

20  _____

21  James A. Teilborg
    Senior United States District Judge

22

23

24

25

26

27

28